FILED

12/08/2023

Clerk of the
Appellate Courts

# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 10, 2023 Session

## STATE OF TENNESSEE v. HAMID HOUBBADI

**Appeal from the Circuit Court for Montgomery County**
**No. 63CC1-2019-CR-400  Robert Bateman, Judge**

_____

### No. M2022-01751-CCA-R3-CD
_____

The Defendant, Hamid Houbbadi, was convicted by a Montgomery County Circuit Court jury of first degree premeditated murder, first degree felony murder, and especially aggravated burglary, for which he received an effective sentence of life plus twelve years. The Defendant raises three issues on appeal: (1) whether the evidence is sufficient to sustain his convictions; (2) whether the trial court erred by admitting orders of protection the victim obtained against the Defendant; and (3) whether the trial court erred in imposing a twelve-year sentence for his especially aggravated burglary conviction and ordering that it be served consecutively to his life sentence. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and KYLE A. HIXSON, JJ., joined.

Manuel B. Russ, Nashville, Tennessee (on appeal); Charles S. Bloodworth, Assistant District Public Defender, Clarksville, Tennessee (at sentencing); and Chase Smith, Clarksville, Tennessee (at trial), for the appellant, Hamid Houbbadi.

Jonathan Skrmetti, Attorney General and Reporter; Katharine K. Decker, Assistant Attorney General; and Robert J. Nash, District Attorney General, for the appellee, State of Tennessee.

## OPINION

# FACTS

This case arises out of the stabbing death of the Defendant's estranged wife, Leila Chanane. According to the State's proof at trial, on October 19, 2018, the Defendant, who was barred from the couple's Clarksville marital residence by the terms of a protective order, parked his vehicle at a nearby Walmart and took an Uber to the marital residence, where he turned off the main circuit breaker inside the house, armed himself with a butcher knife, and waited in the dark for the victim to come home from work. When the victim reached the front porch, the Defendant attacked her with the knife, stabbing her twice in the chest and seven times in the back and upper arm as she attempted to flee. The victim's next-door neighbor discovered the deceased victim lying in the neighbor's driveway early the next morning. A short time later, responding police officers encountered the Defendant inside the marital residence, where he had overdosed on prescription medication and cut his wrists and neck with a straight razor. The Defendant was subsequently indicted for first degree premeditated murder, first degree felony murder in perpetration of or the attempt to perpetrate especially aggravated burglary, and especially aggravated burglary.

At the pretrial hearing at which the trial court considered the admissibility of various evidence, Kevin Fowler, an attorney employed with the Legal Aid Society of Middle Tennessee and the Cumberlands, detailed his representation of the victim as she sought an order of protection against the Defendant. He said that the petition was granted on September 26, 2018, with a hearing set for October 9. On October 9, the parties, through their respective counsel, entered into an agreement that amended the order of protection to allow the Defendant temporary access to the marital residence in order to retrieve his personal clothing and medication, with a new hearing date of November 12. He stated that the amendment was made at the request of the Defendant and reflected the agreement of the parties. When asked by the trial court whether he viewed the October 9 order as an ex parte order or a consent order, he responded, "It's a continuation of the ex parte, or temporary order, and reset the hearing." He then agreed with the trial court that it could also be considered a consent agreement. When pressed on re-cross-examination to say that it remained an ex parte order regardless of the parties' consent, he replied that the statute was not clear "[b]ut it essentially . . . is either converted into a temporary order by agreement of the parties, which binds both parties, or you could say that it extends the ex parte." He acknowledged that a hearing was not held and that the amended order did not contain any findings of fact.

At trial, Detective Michael Luebke of the Clarksville Police Department testified that he responded between 5:00 and 5:15 a.m. on October 20, 2018, to the report of a deceased individual in the driveway of 510 Bellamy Lane. When he arrived, the unresponsive victim had no pulse and was "cold and stiff" with what appeared to be blood on her coat and injuries to her torso. The victim was dressed in a tan coat, black pants, and

t-shirt. There was a scarf covering her face, later described by another witness as a middle eastern hajib, and a set of keys was lying on the ground near her right hand.

Jaymes Thomas Dewitte, the victim's neighbor at 510 Bellamy Lane, testified that he was leaving for work at 5:00 a.m. on October 20, 2018, when he saw the victim's body in his driveway and called 911. He said his wife had come home at approximately 6:30 p.m. the previous day. He and his wife lived alone, and no one visited their home that evening.

Clarksville Police Officer Adam Post, a patrol and crime scene officer, arrived at the scene at 6:15 a.m. and was directed to check the victim's and the Defendant's marital residence, located at 508 Bellamy Lane. He testified that he found the front and back doors locked and noted that the windows were closed. He also noted red-brown stain, or "RBS," on the front porch and front doors and saw a lunchbox in the flowerbed to the right of the front porch. As he was taking photographs, another member of the crime scene team reported that the front door of the residence had been opened. Officer Post and his fellow officers approached, saw the Defendant lying in the doorway, drew their weapons, and ordered the Defendant to show his hands. The Defendant complied, and the officers called for an ambulance and cleared the residence.

Officer Post identified the photographs he took that morning, which included photographs of RBS on the front porch, porch columns, and front doors of the residence; a large butcher knife with RBS on the living room couch; a straight razor, prescription pill bottles, a woman's purse, and large amount of RBS in the hallway bathroom; the Defendant inside an ambulance with bandaged wounds to his wrists and neck; and mulch inside the residence. Officer Post testified that the mulch appeared to match the mulch in the outside flowerbed. He expressed his certainty that none of the police officers tracked mulch into the house.

Attorney Kevin Fowler testified that he had assisted the victim with filing a petition for a temporary, often interchangeably referred to as an "ex parte," order of protection against the Defendant in the Montgomery County Circuit Court. He described for the jury the process involved, including the meaning of "ex parte":

It's often called ex parte order for the first 15 days because that's Latin for "without party." So that order can actually be initially entered without the party knowing about it. Then that individual has to be served in order for the hearing to occur.

He testified that the petition was granted and the ex parte order of protection entered on September 26, 2018, with the hearing set for October 9, 2018. Under the terms of the

ex parte order, the Defendant was to immediately vacate the marital residence pending the hearing.

Mr. Fowler testified that on the October 9, 2018 hearing date, both the victim and the Defendant, who was represented by counsel, agreed to an amendment to the original ex parte order of protection. Under the terms of the amended order, the hearing date was extended to November 12, 2018, and the Defendant was granted access to the marital residence between 12:00 p.m. on October 9, 2018, and 5:00 p.m. on October 10, 2018, to retrieve his personal clothing and medication. All other conditions remained in place, with the victim to resume possession of the marital residence after 5:00 p.m. on October 10. The amended order, which was one of many exhibits admitted at trial, reads in pertinent part: "Respondent may return to the marital home between 12:00 p.m. on October 9, 2018, and 5:00 p.m. on October 10, 2018, to gather and retrieve his personal clothing and medication. Petitioner will return to the home following this period of time."

On cross-examination, Mr. Fowler acknowledged that a hearing was not held on October 9, 2018. He said that an interpreter was present, and that she provided interpretative services to the victim. He stated that the Defendant, through his attorney, was the one who requested the amendment to allow him temporary access to the residence to retrieve his clothing and medication. He acknowledged that he signed the amended order on the behalf of the Defendant's attorney but said it was with the attorney's permission and was a common practice. He could not recall if the Defendant's attorney was present in the courtroom at the time the amended order was signed or entered and said he did not know "at what point [the Defendant] might have been present or what he heard."

Deputy Nicolas Jacob Oakes of the Montgomery County Sheriff's Department identified his signature on the return of service form for the victim's September 26 ex parte order of protection, which reflected that he personally served the Defendant with copies of the petition, notice of the hearing, and the order of protection at 7:15 a.m. on September 27, 2018.

Kenneth Pedrosa, who worked in asset management at the Clarksville Walmart on Wilma Rudolph Boulevard, identified a disc containing October 19, 2018 surveillance video from the store's pharmacy area and parking lot.

Nicole Stephens Papillion, who was working as an Uber driver on October 19, 2018, testified that at approximately 10:40 a.m. that day, she picked up the Defendant from the parking lot of the Wilma Rudolph Boulevard Walmart and dropped him off on Bellamy Lane. She made a positive courtroom identification of the Defendant as the man she picked up that morning. She also identified the Defendant as the man in the Walmart surveillance video standing at the Walmart pharmacy counter and later getting into her vehicle in the

store parking lot. She said that when she dropped the Defendant off on Bellamy Lane, he directed her to stop in the middle of the road in front of a residence instead of having her pull into a driveway. On cross-examination, she acknowledged that the Defendant had to have an established Uber account with identification to summon an Uber ride.

John Jackson, energy services manager at CDE Lightband, identified energy interval data records for the Defendant's and the victim's marital home, which reflected that power to the residence was cut off between 11:00 and 11:15 a.m. on October 19, 2018 and was not restored until between 5:00 and 5:15 p.m. on October 20, 2018. He said there were no weather outrages and no reports of downed lines in the area during that time.

Rebecca Lynn Goppert, a bus driver employed with the Clarksville Transit System, identified security footage from the bus she was driving on October 19, 2018, which showed the victim boarding the bus and later exiting at approximately 6:45 p.m. She said the victim was one of her regular passengers, with the same pick up and drop off locations.

Officer Daniel Binkley of the Clarksville Police Department identified a crime scene video he recorded on October 20, 2018.

Samar Benmansour, a friend of the victim, identified the victim from both a still photograph and from the October 19, 2018 bus surveillance video.

Damien Talley of the YWCA of Nashville and Middle Tennessee testified that he operated a 24-hour domestic violence shelter where the victim resided from September 26 to October 11, 2018.

Officer Tyler Weaver of the Clarksville Police Department testified that on October 11, 2018, he responded to 508 Bellamy Lane, where he spoke to the victim, who was alone. He said the victim wanted him to gain access to a room with a locked interior door and that he attempted to do so but was unsuccessful.

Officer Adam Price of the Clarksville Police Department testified about his role in securing the Defendant's Nissan vehicle, which was discovered in the Walmart parking lot and seized as evidence.

Lieutenant Garland Lester, II of the Montgomery County EMS testified that the Defendant had more cuts to his left wrist than he had ever before seen, with the wound so open that the anatomy of the wrist was exposed. The Defendant also had cuts to his right wrist and to his neck. There was "dried blood everywhere[,]" but the wounds were no longer actively bleeding at the time Lieutenant Lester treated the Defendant and transported him to the hospital.

Retired Clarksville Police Department Detective Terry Minton, the crime scene commander, testified that when he reentered 508 Bellamy Lane with a search warrant after the initial protective sweep of the residence, he found that none of the lights worked. He went outside to look at the electric meter, realized that the power was off, and searched for the circuit breaker box, which he located behind a bookcase in a mud room off the kitchen. He then opened the panel door and saw that the main circuit breaker had been turned to the off position.

Detective Minton identified items of evidence collected in the case, including swabs of RBS found throughout the exterior and interior of the marital residence, a black insulated cooler found in the flowerbed to the right of the front porch, a knife with RBS found on the living room couch, a straight razor found on the floor in the hallway bathroom, and two prescription bottles with RBS on them found in the hallway bathroom. He testified that one of the prescription bottles was for Losartan Potassium with one pill left in the bottle, and the other was for Atorvastatin Calcium and was empty. Both medications had been prescribed to the Defendant and were dated October 19, 2018.

Dr. David Zimmerman, the medical examiner who performed the autopsy of the victim's body, testified that the victim had seven stab wounds to the back and two stab wounds to the chest. He was unable to determine the order in which the wounds were inflicted and documented them as A through I, starting with the wounds on the back. Stab wound A was a penetrating stab wound to the right upper back that passed between the right scapula and the ribs. Stab wound B was a penetrating stab wound to the right upper back with injuries of the skin and underlying muscle. Stab wound C was a penetrating stab wound to the left upper back with injuries of a fractured scapula and incised wounds to the intercostal muscles, upper and lower lobes of the left lung, and left pulmonary artery. Stab wound D was a penetrating stab wound to the back of the left upper arm that went into the upper back, with a fracture of the lateral arc of rib 4 and an incised wound of the skeletal muscle of the left side of the chest. Stab wound E was a penetrating stab wound to the left mid-back with incised wounds of the underlying muscle and of the lower lobe of the left lung. Stab wounds F and G were both penetrating stab wounds to the left lower back in which the wound tracks intersected, with an incised wound of the intercostal muscles between left ribs 10 and 11 and a fracture of left rib 11. Stab wound H was a penetrating stab wound on the left breast below the nipple with incised wounds of the intercostal muscles between left ribs 5 and 6, a fracture of the sternum, an incised wound of the upper lobe of the left lung, an incised wound of the epicardial fat, an incised wound of the diaphragm, and an incised wound of the liver. Stab wound I was a penetrating stab wound to the left lateral chest with injuries to the skin and skeletal muscle.

Dr. Zimmerman testified that stab wound C was a fatal wound that would have resulted in the victim's death within minutes. He said that stab wounds D and E could have

been fatal as well due to the injuries they caused to the victim's lung, which would have made breathing difficult. He stated that neither drugs nor alcohol were detected in the victim's blood, and that there were no defensive wounds on her body. He determined that the victim's cause of death was multiple stab wounds and the manner of death was homicide.

Dr. Zimmerman testified that the knife recovered from the marital residence had a V-shaped side and a blunted side that was consistent with the victim's stab wounds. When asked about the prescription pill bottles recovered from the hallway bathroom, he testified that Losartan was prescribed for high blood pressure and Atorvastatin was prescribed for high cholesterol.

Homicide Detective Jason Kurtich of the Clarksville Police Department testified that the Uber ride records showed that the Defendant was picked up at 10:35 a.m. from the Wilma Rudolph Boulevard Walmart and dropped off at 10:41 a.m. at 511 Bellamy Lane. He identified the buccal swabs he had obtained from the Defendant for his DNA and a set of keys with a Nissan key fob that was found on a bedside nightstand during the execution of the search warrant. On cross-examination, he acknowledged that he obtained search warrants for the Defendant's DNA, vehicle, marital residence, and cell phone despite the Defendant's having given his consent for those searches. On redirect examination, he testified that the Defendant also gave him consent to search the residence in Nashville where the Defendant had been living.

Kathi Gibson, an expert in latent prints employed with the Tennessee Bureau of Investigation ("TBI") Crime Laboratory in Nashville, testified that she was unable to make any identification from the latent prints submitted in the case.

TBI Forensic Scientist Greg Fort, an expert in forensic biology who analyzed the RBS swabs submitted in the case, testified that three swabs from the front porch tested positive for human hemoglobin and matched the victim's DNA profile. Other swabs collected from the exterior and interior of the residence tested positive for blood and matched the Defendant's DNA profile. With respect to the knife found in the residence, a swab from a stain on the blade near the handle tested positive for blood and human hemoglobin and contained a mixture of the DNA of at least two individuals, with the major contributor the Defendant and the DNA profile of the minor contributor deemed to be inconclusive. A swab taken from the handle of the knife where there was no RBS, which did not test positive for blood, contained the DNA profiles of at least two individuals, with the Defendant the major contributor and the DNA profile of the limited minor contributor again deemed inconclusive.

The Defendant elected not to testify and rested his case without presenting any evidence. Following deliberations, the jury convicted the Defendant of first degree premeditated murder, first degree murder during the perpetration of the felony of aggravated burglary, and especially aggravated burglary. The trial court subsequently merged the felony murder conviction into the premeditated murder conviction and sentenced the Defendant to life imprisonment. Finding two enhancement factors applicable and that the Defendant qualified as a dangerous offender under the consecutive sentencing statute, the trial court sentenced the Defendant to the maximum term of twelve years for the especially aggravated burglary conviction and ordered that the sentence be served consecutively to the life sentence, for a total effective sentence of life plus twelve years in the Tennessee Department of Correction.

Following the denial of his motion for new trial, the Defendant filed a timely notice of appeal to this court.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the Defendant challenges the sufficiency of the evidence in support of his convictions. When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

## A. Especially Aggravated Burglary and Felony Murder

The Defendant was convicted of especially aggravated burglary and first degree felony murder in the perpetration of an aggravated burglary. At the time of the offense, especially aggravated burglary was defined as burglary of a habitation or building other than a habitation and where the victim suffers serious bodily injury. *See* Tenn. Code Ann. § 39-14-404(a)(1), (2) (2018). For the purposes of this case, "[a] person commits burglary who, without the effective consent of the property owner: (1) [e]nters a building other than a habitation (or any portion thereof), not open to the public, with intent to commit a felony, theft, or assault[.]" *Id.* at § 39-14-402 (a)(1).

The Defendant's argument that the evidence is insufficient to sustain his felony murder and especially aggravated burglary convictions is based solely on his contention that, as an owner of the residence, he could not be guilty of the burglary of the residence. The Defendant relies on the definition of "owner" in the burglary statutes:

> "Owner" means a person in lawful possession of property whether the possession is actual or constructive. "Owner" does not include a person, who is restrained from the property or habitation by a valid court order or order of protection, *other than an ex parte order of protection*, obtained by the person maintaining residence on the property."

*Id.* at §39-14-401(3) (emphasis added). The Defendant asserts that he falls under the carve-out exception to the above definition because he was originally restrained from the property by the September 26 ex parte order, and a hearing was not held prior to the October 9 amendment to the ex parte order.

We agree with the State that the evidence presented at trial was sufficient for a rational jury to find that the Defendant was legally restrained from the property by the terms of the amended order of protection, and thus, that the Defendant did not meet the statutory definition of owner at the time of the crimes. The jury heard testimony from Attorney Fowler about the process involved in obtaining an ex parte order of protection, the meaning of "ex parte," and that an ex parte order could be obtained without knowledge of the respondent. The jury also heard testimony that the Defendant was personally served

with the ex parte petition, order of protection, and notice of the hearing, and that both the victim and the Defendant, each represented by counsel, appeared in court on the date of the hearing, where the parties agreed to the amendment to the order. Under the terms of the amendment, the Defendant was granted only temporary access to the residence to retrieve his belongings, with the victim to return to the residence after that date. From this evidence, a rational jury could reasonably conclude that the amended order of protection was "a valid court order or order of protection" that legally restrained the Defendant from the marital residence at the time of the crimes, regardless of the absence of a hearing on the petition. Accordingly, we conclude that the evidence is sufficient to sustain the Defendant's felony murder and especially aggravated burglary convictions.

### B. First Degree Premeditated Murder

First degree premeditated murder is the "premeditated and intentional killing of another." Tenn. Code. Ann. § 39-13-202(a)(1). Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill preexist in the mind of the accused for any definite period of time." *Id.* at § 39-13-202(e). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon certain circumstances to infer premeditation. *See State v. Pike*, 978 S.W.2d 904, 914 (Tenn. 1998). The following factors have been used to support a jury's inference of premeditation: (1) the defendant's prior relationship to the victim that might suggest a motive for the killing; (2) the defendant's declarations of intent to kill; (3) the defendant's planning activities before the killing; (4) the manner of the killing, including the defendant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the defendant's demeanor before and after the killing, including a calm demeanor immediately after the killing. *See id.* at 914-15; *State v. Bland*, 958 S.W.2d 651, 660 (Tenn. 1997).

The Defendant contends that, other than his use of a weapon on the unarmed victim, none of the factors outlined in *Bland* and other cases support the jury's finding that he acted in premeditation. He asserts that the evidence instead suggests that he killed the victim "in a passionate rage." In support, he points to "his nearly successful attempts at suicide after [the victim] had been killed." The State argues that there was ample evidence from which the jury could infer premeditation, including the Defendant's attempts to conceal his involvement by hiring an Uber driver to drop him off a few houses away, his procurement of the weapon, his cutting off power to the residence and waiting in darkness for the victim to arrive home, the multiple stab wounds he inflicted on the unarmed victim, and his failure to render aid to the victim. We agree with the State.

Viewed in the light most favorable to the State, the evidence establishes the Defendant, angered at the victim's ending of their relationship, hired an Uber driver to take him to the marital residence to avoid the victim's being warned of his presence by his vehicle parked on the street or in the driveway. Once there, the Defendant armed himself with the knife, shut off the main circuit breaker, and waited in the darkness for the victim to arrive home from work. When the unsuspecting, unarmed victim reached the front porch, the Defendant sprang out and attacked her with the knife, stabbing her twice in the chest and seven more times in the back as she attempted to get away. Afterward, the Defendant made no attempts to render aid or summon help for the victim but instead attempted suicide. We disagree that the Defendant's attempted suicide shows that his killing of the victim occurred in a state of passion rather than with premeditation. Accordingly, we affirm the conviction for first degree premeditated murder.

## II. Admission of Orders of Protection

The Defendant next contends that the trial court erred by admitting the ex parte and amended orders of protection, arguing that they were not admissible to show his motive and intent and that any probative value they held was outweighed by the danger of unfair prejudice. The State disagrees, arguing that the trial court properly admitted the orders to show the Defendant's motive and intent, premeditation, and settled purpose to harm the victim, and that the probative value was not outweighed by the danger of unfair prejudice. We agree with the State.

Tennessee Rule of Evidence 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait" but "may . . . .be admissible for other purposes." The conditions that must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

Tenn. R. Evid. 404(b). Cases in which other "bad act" evidence of an accused will be admissible include those in which the evidence is introduced to show motive, intent, guilty knowledge, identity, absence of mistake or accident, a common scheme or plan, completion of the story, opportunity, and preparation. *See State v. Berry*, 141 S.W.3d 549, 582 (Tenn. 2004); *see also* Neil P. Cohen et al., *Tennessee Law of Evidence* § 4.04[7][a] (6th ed. 2011). When the trial court has substantially complied with procedural requirements, the standard of review for the admission of bad act evidence is abuse of discretion. *State v. DuBose*, 953 S.W.2d 649, 652 (Tenn. 1997).

After considering the evidence presented at the jury-out pretrial hearing, the trial court found that both the original and the amended order, the later of which the trial court referred to as a consent order, met the requirements for admissibility under Tennessee Rule of Evidence 404(b). The trial court ruled inadmissible the petition for the ex parte order of protection, finding that it contained inadmissible hearsay. By finding that the orders met the requirements for admissibility under Rule 404(b), the trial court implicitly found that the bad act evidence was clear and convincing and that its probative value outweighed the danger of unfair prejudice. As for the purpose in admitting the evidence, the trial court stated that it was relying on the holding in *State v. Smoot*, No. E2017-00367-CCA-R3-CD, 2018 WL 4699046 (Tenn. Crim. App. Oct. 1, 2018), *perm. app. denied* (Tenn. Jan. 16, 2019), finding that "under the authority of that case . . . orders of protection can be admissible in these circumstances."

The trial court in *Smoot* admitted orders of protection the victim had obtained against the defendant, finding that they were admissible under Tennessee Rule of Evidence 404(b) "for the purpose of proving identity, motive, intent, and/or premeditation." *Id.* at *17. In our review, we noted that "[o]ur Supreme Court has concluded that 'violent acts indicating the relationship between the victim of a violent crime and the defendant prior to the commission of the offense are relevant to show the defendant's hostility toward the victim, malice, intent, and a settled purpose to harm the victim.'" *Id.* at *19 (quoting *State v. Smith*, 868 S.W.2d 561, 574 (Tenn. 1993)). We, therefore, concluded that the trial court properly admitted the orders of protection themselves, but that it committed harmless error in admitting the petition for the order of protection because of the inadmissible hearsay it contained. *Id.*

Similar to *Smoot,* the orders of protection in the case at bar were relevant and admissible to show the Defendant's intent and premeditation in the killing of the victim. We reject the Defendant's argument that there was no causal connection or chain of logical inferences between the other act evidence and the Defendant's intent and motive in his killing of the victim. A relatively short period of time elapsed between the original September 26 ex parte order of protection, the October 9 amended order of protection, and the October 19 killing of the victim. We agree with the State that the orders of protection

obtained by the victim provided a motive for the Defendant to kill the victim and helped to show that the killing was done after the exercise of reflection and judgment. As the State points out, both our supreme court and this court have previously concluded that episodes of domestic violence between a defendant and victim may show a defendant's motive and intent in the subsequent killing of a victim. *See Smith*, 868 S.W.2d at 574; *State v. Gilley*, 297 S.W.3d 739, 758-59 (Tenn. Crim. App. 2008); *Smoot*, 2018 WL 4699046, at \*19; *State v. Long*, No. E2015-01287-CCA-R3-CD, 2017 WL 2958700, at \*13 (Tenn. Crim. App. July 11, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017). We, therefore, conclude that the trial court acted within its discretion in admitting the evidence.

## III. Sentencing

Lastly, the Defendant contends that the trial court erred by sentencing him to the maximum in his range for his especially aggravated burglary conviction and ordering that he serve the sentence consecutively to his life sentence.

At the March 11, 2022 sentencing hearing, the State introduced the presentence report, which reflected that the forty-three-year-old Defendant had no prior criminal record. The Defendant reported that he had been born in Morocco, had dropped out of school after the eighth grade, and had obtained a two-year vocational certificate from Morocco for tailoring. The Defendant further reported that he had moved from Morocco to the United States in 2007, living first in Knoxville, then Nashville, and finally in Clarksville, where he and his wife had purchased the marital residence in May 2018. Unverified employment information provided by the Defendant was that he had worked as a tailor for Cole Ridge Tailoring and Value Apparel while in Knoxville, and for D and K Menswear in Nashville, where he remained employed until the time of his arrest.

The Defendant reported that he had no family in the United States, but that he regularly spoke by telephone with family members in Morocco and had supportive friends in the United States, who had raised money for his defense. He reported his mental health as poor, stating that he suffered from depression and anxiety and had frequent nightmares about the offense. The Defendant also reported physical health problems, stating that his arms no longer functioned properly after his suicide attempt and that he suffered from high blood pressure, high cholesterol, and diabetes. He denied any problems with drugs or alcohol. He reported that he had been married to the victim for approximately three years and that their relationship was decent until the victim accused him of "creating a problem with her immigration status." The Defendant admitted that he killed the victim by stabbing her with a kitchen knife but reported that he "blacked out after the first stab."

There were no witnesses at the sentencing hearing, but the Defendant made an unsworn statement to the court in which he first said that he was sorry for what he did and

that "nobody deserves to be hurt or be killed." He then launched into a history of his relationship with the victim and what led to the killing, telling the trial court that he wanted a chance to tell his story. He stated that he met and became engaged to the victim in Morocco in July 2014, brought her to the United States on a visa on August 29, 2015, and married her two weeks later. He said the victim at first received a two-year green card and later applied for a ten-year green card but was instead granted a six-month extension.

The Defendant described how the victim became angry and accused him of sabotaging her immigration papers, and the resulting deterioration of their marriage, with his purchasing a lock and beginning to sleep in a separate locked bedroom of the marital residence. He said that on September 26, 2018, he collected the mail and placed it in his locked bedroom. He stated that the victim broke into the room and into his locked safe and stole $11,750. He said he called the police, and the next day the sheriff served him with the order of protection that required him to immediately leave the marital residence. He stated that he retained an attorney and went to court, where he learned that the hearing was being pushed to a later date because the interpreter had another job and the trial judge was not present.

The Defendant stated that when he received a text from Walmart that his auto-filled prescriptions were ready, he drove from Nashville to the Clarksville Walmart. At that point, he decided to go home to search for his stolen money. He stated that he took an Uber because he was not supposed to be at the marital residence and was afraid someone would call the police if they saw his vehicle. When he was inside the residence, he saw a magazine with his attorney's name and phone number, "lost it," and decided to wait to talk to the victim.[1] The Defendant said that he did not know what the victim's relationship was with his attorney, but that he had filed a complaint against the attorney with the Board of Professional Responsibility. Finally, the Defendant stated that he wished he had never gone to his house and that he was sorry.

At the conclusion of the hearing, the trial court found two enhancement factors applicable: that the Defendant treated the victim with exceptional cruelty during the commission of the offense; and that the personal injuries inflicted upon the victim were particularly great. *See* Tenn. Code Ann. § 40-35-114 (5), (6). The trial court found that the Defendant's lack of a prior criminal history possibly applied as a factor in mitigation, but that it was greatly outweighed by the enhancement factors. Accordingly, the trial court sentenced the Defendant as a Range I, standard offender to twelve years for the Class B felony offense of especially aggravated burglary, the maximum sentence in the range.

---

[1] It is not entirely clear from the Defendant's allocution whether he saw a magazine with his attorney's name and number, or a magazine and his attorney's name and number. Regardless, he expressed his suspicion about the victim's having some kind of contact with his attorney.

Based on the testimony and demeanor of the witnesses, the demeanor of the Defendant in his unsworn statement, the proof at trial, and the circumstances of the offense, the trial court found that a consecutive sentence was appropriate and necessary to protect the public from further criminal acts of the Defendant and reasonably related to the severity of the offense. The trial court, therefore, ordered the twelve-year sentence for especially aggravated burglary served consecutively to the life sentence for first degree murder, for a total effective sentence of life plus twelve years in the Tennessee Department of Correction.

This court reviews the length, range, and manner of service imposed by the trial court under an abuse of discretion standard with a presumption of reasonableness. *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012); *State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). The trial court is granted broad discretion to impose a sentence anywhere within the applicable range and the sentencing decision of the trial court will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Bise*, 380 S.W.3d at 709-10. We, likewise, review the trial court's order of consecutive sentencing for abuse of discretion, with a presumption of reasonableness afforded to the trial court's decision. *See State v. Pollard*, 432 S.W.3d 851, 860 (Tenn. 2013) (applying the same deferential standard announced in *Bise,* 380 S.W.3d at 682, to the trial court's consecutive sentencing decisions).

In determining a defendant's sentence, the trial court is to consider the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the mitigating and enhancement factors; (6) any statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the Defendant in his own behalf about sentencing; and (8) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. *See* Tenn. Code Ann. § 40-35-210(b); *see also Bise*, 380 S.W.3d at 697-98.

The Defendant first contends that the trial court erred in sentencing him to twelve years for his especially aggravated burglary conviction, asserting that the trial court misapplied enhancement factors (5) and (6). The State concedes that enhancement factor (6) was misapplied because serious bodily injury was an essential element of the offense. The State argues that the exceptional cruelty enhancement factor was properly applied based on the evidence of the multiple, violent stab wounds the Defendant inflicted, which the State asserts reflected "a heightened level of violence for its own sake." The State further asserts that, in addition to the physical pain the victim experienced from the multiple

- 15 -

stab wounds, "the last moments of [her] life would have been strikingly tortuous as she realized that the defendant was going to continue to attack her, as though hunting an already wounded animal" and that "[t]hat period of terror was not required for the offense of especially aggravated burglary."

We agree with the State. Evidence supporting the application of the exceptional cruelty enhancement factor requires a finding of cruelty "over and above" what is required for the offense itself. *State v. Arnett*, 49 S.W.3d 250, 258 (Tenn. 2001). This court has found the exceptional cruelty enhancement factor properly applied in cases in which, as here, the victim sustained severe injuries, including both physical and emotional, over and above those required for the underlying offense. *See e.g.*, *State v. Gray*, 960 S.W.2d 598, 611 (Tenn. Crim. App. 1997) (affirming application of exceptional cruelty enhancement factor to conviction for especially aggravated kidnapping conviction based on the defendant's psychological abuse of the victim); *State v. Gadsden*, No. M2019-01385-CCA-R3-CD, 2020 WL 6791251, at *13 (Tenn. Crim. App. Nov. 19, 2011) (affirming application of exceptional cruelty enhancement factor to convictions for second degree murder and Class D felony theft of property convictions based on the multiple stab wounds the defendant inflicted on the victim, including as the victim attempted to flee). As for the trial court's misapplication of enhancement factor (6), a "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 [Sentencing] Act, as amended in 2005." *Bise*, 380 S.W.3d at 706. Because the trial court imposed a within-range sentence consistent with the purposes and principles of the Sentencing Act, we affirm the twelve-year-sentence for especially aggravated burglary.

The Defendant next contends that the trial court erred in ordering consecutive sentencing, arguing that there were no aggravating circumstances to justify the imposition of consecutive sentences under the dangerous offender factor of the statute. The State disagrees, arguing that the trial court provided a reasonable justification for consecutive sentencing based on the multiple stab wounds and the manner in which the wounds were inflicted. We, again, agree with the State.

A trial court may order that multiple sentences run consecutively if it finds by a preponderance of evidence that one or more of the seven factors listed in Tennessee Code Annotated section 40-35-115(b) applies, including factor (4), that the defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. Tenn. Code Ann. § 40-35-115(b)(4). When the trial court bases consecutive sentencing upon its classification of the defendant as a dangerous offender, it must also find that an extended sentence is necessary to protect the public against further criminal conduct by the defendant and that the consecutive sentences reasonably relate to the severity of the offense

committed. *State v. Lane*, 3 S.W.3d 456, 460-61 (Tenn. 1999); *State v. Wilkerson*, 905 S.W.2d 933, 937-38 (Tenn. 1995).

In ordering that the Defendant serve his twelve-year sentence consecutively to his life sentence, the trial court focused on the brutal manner of the multiple-stab wound killing, finding that the Defendant's actions evidenced a "complete disregard for the life of the victim." The trial court further found that the extended sentence was necessary to protect the public against further criminal conduct by the Defendant and reasonably related to the severity of the offense.

The Defendant argues that the trial court ignored the principles of *State v. Howell*, 34 S.W. 3d 484, 493 (Tenn. 2000), and *Gray v. State*, 538 S.W.2d 391, 393 (Tenn. 1976) that "crimes must present aggravating circumstances in addition to the inherent nature" of the crimes in order to warrant consecutive sentencing. The Defendant relies on the following language from *Howell*:

> In *Gray*, our supreme court ruled that before consecutive sentencing could be imposed upon the dangerous offender, considered the most subjective of the classifications and the most difficult to apply, other conditions must be present: (a) that the crimes involved aggravating circumstances; (b) that consecutive sentences are a necessary means to protect the public from the defendant; and (c) that the term reasonably relates to the severity of the offenses.

34 S.W.3d at 493. The Defendant cites the following language from *Gray*: "The decision to impose consecutive sentences when crimes inherently dangerous are involved should be based upon the presence of aggravating circumstances and not merely on the fact that two or more dangerous crimes were committed." 538 S.W. 2d at 393.

The Defendant's reliance on *Howell* and *Gray*, however, is of no avail here. Although it did not use that specific phrase, the trial court, in ordering consecutive sentences, relied upon the "aggravated circumstances" involved in the offenses, in which the Defendant stabbed the victim nine times with a knife, including seven times to her back. Under the circumstances in this case, we conclude that the record supports the trial court's imposition of consecutive sentencing.

## CONCLUSION

Based on our review, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE